**McCURRACH et al. v. CHENEY BROS.**

District Court, S. D. New York.

Nov. 30, 1944.

John B. Cuningham, of New York City (Fish, Richardson & Neave, of New York City, of counsel), for plaintiffs.

Thomas J. Byrne, of New York City (Cooper, Kerr & Dunham, of New York City, Joseph K. Schofield, of Hartford, Conn., and Thomas J. Byrne, of New York City, of counsel), for defendant.

HULBERT, District Judge.

There are two United States Patents before the Court. Both relate to improvements in neckties.

Mabel C. McCurrach filed her application (Serial No. 213,570) on June 14, 1938, and Letters Patent No. 2,178,893 were issued to the plaintiff, as assignor, November 7, 1939.

Frank D. Cheney and Albert Tedford filed an application (Serial No. 406,782) on August 14, 1941, and Letters Patent No. 2,291,531 issued to the defendant, as assignor, July 28, 1942.

This action was commenced November 25, 1942, for an alleged infringement. Plaintiff prayed for an injunction and an accounting.

Some 14 months later, after examinations before trial had been had, the plaintiff, claiming the defendant's conception was a studied effort to evade infringement, was permitted, by leave of Court, to add two additional causes of action:

(a) The second new cause of action was based upon interfering patents. R.S. § 4918, 35 U.S.C.A. § 266.

(b) The third new cause of action alleges that the defendant's patent is not infringed, is invalid and a declaratory judgment is sought. Jud.Code, § 274 D, 28 U.S.C.A. § 400.

Defendant has not put its patent in issue by a cross-claim. Its position is that none of the claims in either patent conflict with any of the claims in the other.

The right to an accounting was expressly waived by the plaintiff at the trial.

From the nature of the action, and its presentation, it seems desirable to review the evidence at some length preparatory to stating my disposition of the case.

Plaintiff and its predecessors have been in business since 1878, manufacturing men's ties and the materials that go into them, selling to haberdasheries, men's furnishing stores and department stores throughout the country.

The defendant has been in business for an even longer period, manufacturing neckwear, draperies, velvets (both upholstery and dress) and yarns; also dyeing, printing and engraving.

According to Webster's International Dictionary:

"A necktie is a scarf, band or kerchief of silk, etc., passing around the neck or collar

and ties in front; a bow of silk, etc., fastened in front of the neck."

There are still men who wear bow ties but cannot themselves tie them.

Both litigants manufactured a four-in-hand tie which has been known to the trade for about 35 years.

It was testified by Mr. McCurrach that window trimmers and a few sophisticates could tie the conventional four-in-hand tie with a "dimple" by the exercise of care and skill. The creation of some means by which the ordinary wearer could attain that perfection in putting on his cravat was sought by those in the trade for some years past.

Mr. McCurrach's mother, who succeeded to the management of the business when his father became physically incapacitated, was engaged in this effort when her son saw a friend wearing a cravat tied with a perfect dimple. Mr. McCurrach borrowed the tie and sent it to his mother with a letter dated May 14, 1938 (in evidence). She, meanwhile, had obtained an idea from the pleats in a lamp shade and finally conceived a lining formed of a strip of relatively stiff flat textile material compressed or indented along generally longitudinal extending lines, one centrally disposed and indented from the outer or front surface of the lining and preferably two or more additional lines extending generally parallel to the side edges of the lining indented from the opposite surface of the lining, the lines in the lining were to be formed by means of a hot iron, or other compressing or embossing means, having an edge formed thereon to indent or emboss a length of the lining extending far enough longitudinally to include the entire knot forming portion of the tie, the central line to be indented from the front surface of the lining toward the rear surface and the lateral lines indented from the rear surface of the lining toward the front. This would give the lining a natural tendency to pleat or fold along the indented lines of compression, the lining, however, not being actually pleated along the compressed lines so that with each tying of the necktie a natural dimple or fold would be formed below the knot disposed centrally and extending vertically below the knot, and finally, to provide the tie just below the knot with a tendency for its side edges to fold or turn backward; to accomplish that result lines of compression were formed closely adjacent and parallel to the side edges of the lining.

The claims, as originally presented by the applicant, were withdrawn, upon objection of the Patent Examiner, without prejudice, and the following were allowed:

Claim one reads as follows:

"A four-in-hand necktie having between the front and rear walls at the knot-tying region of the necktie an elongated prefolded pleat-forming element of relatively firm fabric, said pleat-forming element having three longitudinal pleats which are free to expand and contract laterally (sic), the center pleat extending toward the rear of the tie and the side pleats extending toward the front of the tie to provide said pleat-forming element with a cross section of generally M-shape."

Claim two merely inserts the word "resilient" after the word "elongated" and before the word "prefolded" in the third line above.

At the time plaintiff's application was filed the prefolding was done by means of heat applied through the medium of hand irons but subsequently three sets of dies were made by Mutual Machine Company November, 1938, December 22, 1938, and February 2, 1939, respectively. They are "male" and "female"; that is, as positioned in the machine the top die has three projections on the surface which fit into three grooves in the bottom die. The lining is inserted, the dies are brought together under pressure with a heavy lever and heat is supplied through a connecting heating unit and the lining takes on an M-shape. As thus creased it is put in the body of the tie and then the whole is pressed by an ordinary iron.

Mr. McCurrach testified that, in the early stage, depending upon the quality of the material, the lining might be creased too deeply to work satisfactorily. This necessitated experimentation with different weight linings and consequent adjustment of the pitch to get the proper angle or degree of the "M." It was found by experiment that the important thing was what happened to the apex of the three V's which formed the "M" because that became permanent. By sharpening the point at the top, without changing the angle, it produced a more permanent crease without as much angle in the lining itself—without as much pitch, a strong crease still resulted.

Ties of prefolded linings made under the plaintiff's patent were delivered to its salesmen with written instructions dated July 14,

1938 (in evidence), for the purpose of securing a "wear test" and comments thereon. They were generally well received; there were some complaints and improvements followed. It was found, for example, that the degree of pleating in a light weight silk should be a little different than in a heavy weight silk. Plaintiff made up several good sized patterns or assortments of neckties and sold them to dealers to see what public interest was created. Lord & Taylor and Woodward and Lathrop advertised them in 1939. Such ties were marketed for about 1½ years and then temporarily discontinued because of difficulty of production during the existing war period; but plaintiff intends to resume the manufacture and sale of these ties as soon as conditions make it possible.

Frank D. Cheney, connected with the defendant for the past 40 years, and latterly in charge of the project development work of his Company, testified that defendant's dimple tie originated with himself and Alfred Tedford (Superintendent of the Cravat Manufacturing Department of the defendant) in the summer of 1940; that it was his endeavor to keep informed of competitive products but he was not aware of any others in the necktie industry who had put out or attempted to put out a dimpled tie until about October 1940, when he learned for the first time of the existence of the plaintiff's patent.

Mr. Tedford also learned of the McCurrach patent for the first time in October 1940. He met McCurrach in November of that year. Mr. Taylor, who was then Sales Manager for the defendant at New York, telephoned Tedford at the mill in Manchester, Conn., that McCurrach had a machine for folding neckties and wanted Tedford to look at it. Mr. Goodridge of the McCurrach organization met Tedford at the defendant's New York office and took him and Taylor to the McCurrach factory in Brooklyn where Tedford saw the Malek Folding Machine in operation in a large room with a lot of employees working on neckties which they were folding on the Malek Machine and assembling. However, when Tedford was examined before trial, three years later, he testified he had never seen one of plaintiff's dimpled ties.

On said examination before trial, Mr. Tedford described the construction and operation of the lining which the defendant made under its patent. Mr. Cheney confirmed it.

The associated efforts of Cheney and Tedford to produce a dimpled tie were undertaken subsequent to the issuance of plaintiff's patent.

There were three constructions 30 to 60 days prior to March 5, 1940, and the final construction during March 1941 or on the first or second of April, 1941 (Exhibit 28). The finished tie, containing the first of these three prior constructions of a dimpled tie, was a lining pressed centrally in the direction of its length, forming a crease, with the two edges of the tie folded forward into a V shape. The second construction was made by pressing the lining of the tie in the manner described for the finished tie; it was then inserted into the tie fabric. The third was similar to the second as to the central crease, and it had two other longitudinal creases, one on either side of the central crease, pressed in the opposite direction. Those were V-shaped troughs in the lining. The result of the experiment with the first construction made a very unsightly tie. It was immediately abandoned. The second construction was the outgrowth of the first, and the third was experimented with at the same time throughout 1940 but not beyond March 1941. The second construction produced a satisfactory dimple.

Mr. Cheney testified, but later corrected the statement by eliminating the words in parenthesis, and inserting the words italicized, that:

"We discontinued (both 2 and) 3 (for two reasons) *because* we found that the creases showed through on the face of the tie, which we believed would make the tie unsightly as it hung upon the display rack in the merchant's store. The second reason was that we found that when tied, (the M shape—I shouldn't say M shape—) *the M shaped lining,* they are all M shaped when (they are) tied *properly,* had a tendency to contract more than the tie silk did (and it made) *giving a rumpled appearance and* a narrow, thin drape below the knot. Another reason was that after restudying the McCurrach patent, we were of the opinion that our construction wasn't sufficiently different from that construction."

Through 1940 the defendant's assignors used silk foulards—a fairly light material—as facing in constructions two and three. From March 1940, and for a couple of months in 1941, they were considering the V-pleat in the lining of construction of No. 2. With respect to creases showing on the face of the ties that hung untied on the

rack, they had made a decision that they considered No. 2 superior to No. 3 in many ways, but later revised that decision and decided a modified No. 3—less sharply creased V's—was better than No. 2. Mr. Cheney said:

"We found it best, after pressing these sharply creased V's, to lay the lining out flat and press it in its flat condition in order to reduce the sharpness and the angle of the V".

"Q. That was really construction No. 4 then, wasn't it? A. No. No. 4 was the one with the loop under it."

The reasons for considering No. 2 superior to No. 3 were:

"the absence of the sharp lines showing on the face of the tie material, the fact that it did not contract into as narrow a knot when tied as No. 3, the fact that when tied, the contraction of the lining did not cause the lining to come away from the inner edges of the tie as much as was the case with No. 3."

In other words, it was "to reduce these objections."

"Q. Then following this experiment, which for convenience I would like to call No. 5, you thought of the construction exemplified in Exhibit 2 (28 in evidence)? A. That is correct.

"Q. And that was some time early in and prior to (sic) April, 1941? * * * A. It was either prior to April or in the first day or two of April, 1941."

"Q. Is my understanding correct, Mr. Cheney that the defendant has not at present decided to abandon the construction exemplified in Exhibit 2 (28 in evidence) in favor of any subsequent construction? A. That is correct.

"Q. Were any of these three or four prior constructions made the subject of a patent application? A. No.

"Q. However, the construction exemplified by Exhibit 2 (28 in evidence) was made the subject of a patent application, certified copy of which I show you, and which has heretofore been marked Exhibit 1 (Plaintiff's Ex. 5 in evidence)? A. That is correct."

Meanwhile there was an exchange of illuminating correspondence between defendant's assignors and their patent attorney.

On October 22, 1940, Mr. Schofield wrote to Mr. Cheney:

"Enclosed I send you copies of four U.S. patents showing four-in-hand cravats. (One was that of the plaintiff)

"Each of these patents shows a lining for a four-in-hand which is adapted to form a central longitudinally extending depression in the outer fold just below the knot. The linings in each of the patents are preformed in some manner in an attempt to induce proper formation of the folds.

"No patent located in this search shows your idea of centrally creasing the lining. In view of the fold not being shown, it is thought that there is a probability of a limited patent being granted covering your form of creased or preformed lining.

"If you wish me to proceed to prepare and file an application, I shall be glad to do so and have ample information and material for that purpose in my office. Any claims granted would be necessarily very limited but at least the words "Pat. Applied for" can be used on the ties even in the event we encounter difficulty in obtaining the allowance of any claims."

In reply to that letter on October 28, 1940, Mr. Cheney stated:

"I am interested to note that your search has brought out four United States Patents showing four-in-hand cravats. I have not yet had time to study these carefully but in cursory examination of them it would seem that Patent 2,114,376 by David Goldman of New York City, Patent 2,123,900 by Max Kleinman of New York City, Patent 2,126,836 by Alfred J. Steinberger of Jamaica, N. Y. and Patent 2,178,893 by Mabel C. McCurrach of Brooklyn, N. Y., have the same objective as we have in mind as the invention which I discussed with you on October 17th although they appear to attempt to arrive at that objective by entirely different methods which do not seem to be in conflict with our idea.

"As soon as possible, Mr. Tedford and I will go over these patents with more care. In the meantime, we have a new idea which we may combine with the idea disclosed to you, which we think may make a still greater improvement with the drape and appearance of the tie.

"Our experience has been that it takes two or three weeks to complete a practical wear test upon cravats made along these lines, and it will therefore probably be approximately that time before we will be ready for another conversation with you."

238

The next letter is from Mr. Cheney to Mr. Schofield dated April 2, 1941:

"We have continued since then with our experiments and most unfortunately we did not give sufficient careful study to Patent #2,178,893, Mabel C. McCurrach, which we are returning herewith. Please note the drawing of Figure 3 and reference to Figure 3 on page Two, Paragraph Three describing a modification of the intention which seems to us to exactly conform to the idea which we have been working on, since my conversation with you, namely three pleats in the knot forming part of the tie instead of the single pleat which I discussed with you. As a result of our experiments we became convinced that the three pleats were superior to the single centrally located pleat.

"We have recently reviewed the McCurrah patent #2,178,893, with the care which we should have exercised in the first instance and it seems to us that Claims 1 and 2 in this patent anticipate both our more recently tried experiment upon a lining pre-folded in three folds, as well as the original idea which I discussed with you in October for a single centrally located fold formed by prefolding and pleating. The description in the body of the patent describes three pre-pleated folds and the claims also mention the three longitudinal pleats. As I understand it, therefore, we are anticipated in our idea of employing three creases, or pleats, regardless of the method used for producing these pleats, but that in your opinion the patent does not prevent us from employing one centrally located pleat. Will you kindly advise us whether the above understanding is correct. Please return the patent with your reply.

"While you are considering this matter, will you also please give thought to this proposal: Our objective does not necessarily require the forming of a pleat in the tie before the tie is tied. What we are attempting to accomplish is to give the lining a tendency to form a pleat when it is tied in a knot. We have found the actual formation of a pleat objectionable because when the tie is tied it gives a sharp crease on the edges bordering the dimple. We have therefore found it desirable, after pleating, to press the entire lining absolutely flat with considerable pressure, so that no pleat remains—the only thing remaining being a tendency to pleat. Is this an infringement of the McCurrach patent?

"Following the same line of thought: namely the objective of creating a tendency of the tie to fall into folds, we believe we can accomplish the same thing by pressing longitudinal stripes into the lining either by means of heated discs running between the lining and the fixed plate, or revolving steel roll, or by accomplishing the same in a press. We would, however emboss stripes, the centrally located one of which would be embossed with the heated element applied on the front side of the lining and the two outside stripes would be embossed from the opposite side of the lining. The lining itself, however, would remain smooth. Is this, in your opinion, any infringement of the McCurrach patent?"

Mr. Schofield replied under date of April 4, 1941:

"The two claims of this patent call for *three* longitudinal pleats so that if you make use of one pleat you will not infringe this patent.

"In view of Fig. 3 of this patent, I must retract my statement that there is a probability of a limited patent being granted covering your form of preformed lining having a central pleat. It is almost invariably held not to be patentable to omit part of a construction with its accompanying utility. In your case you would merely be omitting the two side creases and using the central one only.

"These McCurrach claims will be infringed whether the three longitudinal pleats are *partially* pressed out or left in for the reason that the effect of the pleats would remain and they would be free to expand and contract laterally. If you can *completely* eliminate the creases or pleats there will be no infringement but I do not see how you can remove them without removing all tendency to pleat.

"The construction described in the last paragraph of your letter I think will evade infringement for the reason that the parallel creases or stripes would not freely expand and contract laterally and provide a generally M shape in cross section. I should, however, like to see a lining with these longitudinal stripes before committing myself definitely.

"I note the McCurrach patent is assigned, which would make it awkward to obtain a license if you found three pleats to be advantageous over your alternative suggestions. It may be, however, that the modi-

fied form of construction shown in Fig. 3 of this patent may not be commercially used and that rights limited to the use of this form of the invention could be obtained very reasonably.

"I find that I still have the models which you handed me last October and will return them if you wish."

Referring to the statement contained in the letter from Mr. Schofield dated October 22, 1940: "If you wish me to proceed to prepare and file an application, I shall be glad to do so and have ample information and material for that purpose in my office" Mr. Cheney was asked:

"Q. What disclosure or disclosures, if any, prior to this letter, had you sent to Mr. Schofield in this connection? A. I had sent none. I had had a conversation with Mr. Schofield, at which time the disclosures were made.

"Q. Is that the ample material and information to which he refers, if you know? A. I assume so.

"Q. Nothing in writing? A. Nothing in my file. (Addressing Mr. Schofield) You have nothing in writing have you? Who replied: 'No. Just an exhibit or sample' and witness continued: A. I did not write him anything about it.

"Q. Did Mr. Tedford, if you know? A. No. * * *

"Q. No written records, or no description of these various prior attempts at developing a dimple tie? A. Yes, we have one written record of it.

"Q. Will you produce it please? A. That is my letter to Mr. Tedford dated Mar. 5, 1940. That is the only written record I know of."

It was received in evidence as Exhibit 29, and reads as follows:

"Confirming our telephone conversation of this morning, I am returning three ties to you as follows:

"1. The red tie made of the patented construction, which was submitted to you by Mr. W. A. Taylor, the lining being made with a narrow strip stitched to each side at the big end and the small line of perforations in the center of the lining for the purpose of causing the tie to form or drape readily with a dimple in the center of the tie. I have given this tie a wear test and in my opinion it is not satisfactory and is certainly not worth the additional cost of manufacture which would be involved.

Furthermore, I think it is inferior to our own experiment, #2, which follows:

"2. A tie having a lining slightly creased in the center for a distance of 3" to 4" for the purpose of causing a dimple to form in the center of the tie instead of on either side. I have given this a wear test and find that the dimple forms automatically and makes a very nice appearing knot. This tie, like most of our foulard ties, still has an objectionable feature, namely when tied the small end has a tendency to slip out to the right which interferes with the attractive appearance of the tie. In order to overcome this, you were to construct a tie with a small crosswise loop sewed to the back of the tie, an inch or two below where the knot is formed. The purpose of this being to draw the small end down through this loop and thus prevent it from slipping out to the side of the tie after it is tied. You and I felt that the crease in the center of the lining was too sharp and decided that in your next attempt you would make a rounded crease rather than a sharp one, for the purpose of giving the tie a tendency to form a dimple at this point rather than for the purpose of actually forming the dimple by the crease.

"3. A tie made upon the same principal as #2 having a triple crease in the lining instead of a single crease. I consider this inferior to #2 because (a) the triple crease causes too much dimple. (b) it contracts the lining so much that the lining fails to fill the tie, at the point where the creases are made, by approximately ¼" on each side.

"I recommend that you write to Mr. Taylor saying that you and I have both given the patented tie a wear test and that we do not like it, and that you also send him, at the same time, a tie constructed like #2 above. I hope to be at his office sometime Thursday, at which time I will make a point of discussing this with him."

The witness was unable to definitely identify the patent under which the red tie referred to was made.

The defendant's dies are shown in Fig. 6 of its patent. There is a central projection on one plate and two side projections on the other—males, with no female—and when the lining is inserted, the dies pressed together with a hand press and the heat electrically applied, it produces an indentation in the lining itself. The lining is then in-

serted in the tie casing and the whole pressed with an ordinary iron.

Mr. Cheney produced a lining of no formation, a lining indented to illustrate the product of the defendant's patent, and a lining pre-formed to illustrate the product of the plaintiff's patent. To accomplish this latter result, Mr. Cheney had made in the defendant's machine shop a set of dies in accordance with a drawing of the plaintiff's dies attached to an affidavit of the plaintiff's former attorney, verified April 6, 1944, submitted on a motion in the case. Samples of plaintiff's finished ties had been furnished to the defendant in May 1943, December 1943, and May 1944. The defendant had been permitted to inspect the plaintiff's dies in June 1944 and had known of their existence since September 23, 1942, but no request was made of the plaintiff for the use of its dies for the purpose of producing linings pre-formed under the defendant's patent. As a matter of fact, it was necessary for the defendant's Engineering Department to make an isometric drawing from the sketch attached to Mr. Schumacher's affidavit because it was found that it was not sufficiently accurate to permit dies made exactly in conformity with that drawing to mesh throughout the stated depth. They made such slight corrections as they thought necessary in order to accomplish that. Upon this subject, Mr. Cheney testified:

"Furthermore, there were two drawings attached to affidavit, one very much smaller than the other, too small to accomplish its purpose,—the second one too large to accomplish its purpose. The isometric drawing was made substantially, with the ridges substantially the same distance apart as we found in linings previously furnished to us by Mr. Cuningham or Mr. McCurrach."

"The Court: Well, are the dies 10 and 11 (Plaintiff's dies) and Q–1 and Q–2 (defendant's reproduction) drawn to the same scale?

"The Witness: No your Honor."

Mr. Cheney also produced photostats of these linings after described treatment and then exhibited shadowgraphs of cross sec-tions cut from some of the ties examined and in evidence for comparison and submitted a table of his observations upon the results.

The Court has given little weight to this testimony. The dissimilarity of the McCurrach dies and those made by the defendant lead to doubt as to the accuracy of the comparison; the "tables of observation" were said to have been based upon the measurements made by Mr. Cheney, and his co-inventor, or under his direction, while they were present, but Tedford, who was examined before and at the trial, was not interrogated upon that subject at all; no proof was given as to the amount of heat and pressure applied in pressing; no effort was made to determine the stretch of the lining material in any such tests, although the witness did testify: "We wanted to measure these linings before pressing, after pressing, and observe them in operation and so forth." Nevertheless, he testified that he had had no experience with Plaintiff's dies upon which to form an opinion.

During his direct examination by his counsel, Mr. Cheney was given four ties for comparison with the aid of the shadowgraph; Exhibits V, W,* Z, and AA. He said V was a lining prefolded with defendant's reproduction of plaintiff's dies and showed a marked M shape in the cross section; Exhibit Z, a tie furnished by plaintiff's counsel December 20, 1943, showed a pronounced M shape in cross section; AA received from plaintiff's counsel in May 1944 was conspicuous by the absence of an M shape in its cross section.

"By the Court: Would you say that the lining of this tie more closely resembles the indentation as represented by the Cheney tie, rather than a prefolding? A. Yes."

Mr. Cuningham then stated it was made by the plaintiff's dies.

"By the Court: Do you know whether or not there are any indentations in the lining which you have just examined, Mr. Cheney? A. I do not know.

"Mr. Byrne: Indentations like the indentations of the Cheney and Tedford patent?

---

* According to the record, Exhibit W for identification (SM p. 292) does not appear to have been received and marked in evidence, although Mr. Cheney testified that Exhibit X–3 in evidence was a photostat of Exhibit W, which he described as a lining indented by the defendant's dies and inserted in a tie which he had in court and expected to use later in another illustration. After the four exhibits above mentioned were handed to Mr. Cheney, Exhibit W was neither referred to in his direct examination nor his cross-examination.

"The Court: Well, I asked him a moment ago if it didn't look more like the indentations in the Cheney ties than it did the prefolding in the plaintiff's tie, and he said yes.

"Mr. Byrne: Yes, but I want to make sure whether or not there are any indentations in that lining. I want the record straight.

"The Court: Well, let me ask him now. Q. Examining the lining of Ex. AA would you say that it shows an indenture or a prefolding? A. Your Honor, I can't positively state that. It bears a much closer resemblance to the indented lining than to the prefolded linings which have previously been furnished to us. We will have a subsequent exhibit made of cross sections cut from each of these ties which will illustrate that point far better than any description that I could give you. * * *"

Later, describing his own dies Cheney testified:

"The best description I could give of them is that they have a generally triangular shape, with the apex of the triangle planed off to a width of about between 1/64th and 1/32nd of an inch."

When shown the plaintiff's dies, and his attention having been directed to the lateral projections or triangular points, he was asked:

"Q. Are those planed off at the top? A. I don't know whether they are. They don't appear to me to be.

"Q. Are they sharp? A. They are not sharp, no.

"Q. Is the same true of the central projection on Exhibit 11? A. The central projection on Exhibit 11 is sharper than the projection on the other member, Exhibit 10.

"Q. Now, would you say that this center projection on Ex. 11 when used in co-operation with the depression on Ex. 10 would put a longitudinally indented line compressed into a necktie lining? A. I have no experience with this pair of dies upon which to form an opinion.

"Q. Are the three lines, Ex. Z, lines of compression? A. I don't know whether that lining was folded and pressed or whether it was done in a die. If it was folded and pressed the points would be, I assume, thinner than the two folds together. I don't know.

"Q. There would be an indentation in the point if it were folded, is that what you mean? A. No.

"Q. You say they would be thinner? A. I think that was probably an honorary observation."

Prior Art

Defendant has introduced United States Patents:

(a) Mark Prager No. 903,607, issued November 10, 1908.

The chief object of this inventor appears to have been to provide a necktie which could be tied or knotted by the wearer, and tended to retain its normal shape "for an extended period, and which does not show creases or fold marks."

(Incidentally, Mrs. McCurrach's device, without any apparent intention on her part, does stabilize the tie and prevent it from rolling and turning, and which is an objection often experienced with conventional four-in-hand ties.)

(b) Richard A. Cloke, No. 1,990,167, issued February 5, 1935.

The theory here set forth was to give all forms of four-in-hand ties an improved appearance which can be attained by the ordinary wearer without any particular skill. The concavity produced is an approach to a dimple, at least, and was to be accomplished by a gathering of the portion of the tie body in the rear by means of a stitch taken entirely through the body, including the lining. Instead of using the stitch other equivalent methods may be used such as a wire, clip or clamps and if sufficient pressure is applied a similar effect may be produced by pressing the tie. A thread of a contrasting color was also included to assist the wearer in locating the draped portion of the tie below the knot. McCurrach tested this claimed invention and considered it impractical commercially.

(c) James Faller, No. 2,034,652, issued March 17, 1936.

This inventor pointed out that each edge of the front end of the tie should be folded forwardly within the knot so that when viewed from the front each edge is directed forwardly where it emerges from the lower end of the knot, the central portion being convex in cross-section and a valley appearing between the convex central portion and each outer turned edge or a conversely stated result. The necktie is provided with folding lines extending longitudinally of

the tie near the opposite edges, respectively, whereby the tie tends to fold transversely as described when knotted. The fold lines may extend the full length of the tie or only along and/or near the portion to be knotted, but in any event they must extend in the region of the knot. While the fold lines may be formed in many ways they are preferably formed in or by the lining, as for example by slitting the lining near the edges or making it stiffer and/or thicker along the margins than through the central portions. This patent was acquired by Cluett-Peabody & Co., of Troy, New York, but it was apparently never put to actual use; instead they had prepared and distributed a display card to illustrate how an ordinary wearer of a necktie should apply the required skill to put the dimple drape in a conventional tie.

(d) David Goldman, No. 2,114,376, issued April 19, 1938.

The purpose of this invention was to characterize a necktie with a lining formed with a longitudinally extending tubular pleat along its center adapted to assist in forming small gathers at the center of the tie below the knot during the knotting of the tie. The tubular pleat to be formed by bending upwards towards a tubular portion of the lining along the front half thereof, and maintaining this tubular shape by a line of stitches, extended along the junction of the tubular portion and the main portion of the lining. This patent contemplates a partial manual operation in effecting the dimple.

Not one of the foregoing patents was cited in the Patent Office for anticipation, but solely to show the state of the art.

The Patent Office did cite Kleinman, No. 2,113,113, issued April 5, 1938, but while the defendant pled it, did not rely upon it at the trial; instead a later patent to Kleinman, No. 2,123,900, issued July 19, 1938, was introduced. This patent was issued after plaintiff's assignor had filed her application (June 14, 1938) and of course, was not cited by the Examiner.

■■■ Novelty and utility are not enough to sustain a patent, but validity rests on novelty beyond the skill of "an ordinary mechanic acquainted with the business." Hotchkiss v. Greenwood, 52 U.S. 248, 267, 13 L.Ed. 683. If every conception were within the skill of "an ordinary mechanic" there would be no new patents. Therefore invention must be the exercise of

extraordinary skill over that of the reasonably skilled mechanic. That, in the last analysis, is a question of fact for the trial court to determine.

■■■ The evidence satisfies me that Mrs. McCurrach found what every one of her predecessors (and perhaps others) had unsuccessfully sought.

In White Co. v. Morton E. Converse & Son Co., 2 Cir., 20 F.2d 311, at page 313 the court sustained a patent for a child's vehicle stating:

"We see in this an invention just because, being so simple, it had not occurred to anyone before."

Mrs. McCurrach brought into being a novel and useful instrumentality of personal adornment that the skill of ordinary designers in that field had failed to perceive and perfect. Consequently, I hold the patent valid.

Mr. Cheney testified that the defendant had made up about 132 dozen ties for experimental purposes, i.e.—

"developing the press that we use, and seeing that this operation was correct. Those linings were put into ties which were not labeled in any manner to identify them, they were not sold as dimple forming ties; they were not advertized as dimple forming ties."

"The Court: Did you ever sell any commercial ties made under your patent? A. No.

"Mr. Cuningham: Your Honor, the test is that for jurisdictional purposes if they had made at least one sale—

"Mr. Byrne: I don't believe that Mr. Cheney understood that last question fully. The fact is, if the Court please, that these linings were embodied in neckties, not as dimpled neckties, and they were sold. Where they were sold we don't know, but we presume they were in this jurisdiction. No question as to jurisdiction over the matter.

"The Witness: That is correct. * * *

"The Court: When did you discontinue the use of any of your ties of the indented lining? A. In August 1941—except for the exhibits which have been made and shown during this trial."

The defendant's patent issued August 14, 1941.

The evidence satisfies me that the defendant infringed the plaintiff's patent.

The defendant challenges the validity of plaintiff's patent:

(a) Because the method of forming the lining is neither shown nor described;

(b) The die for making the lining was not acquired until nearly six months after the application was filed;

(c) At the time of filing the application the McCurrach tie-linings were folded by hand, and

(d) The dies were not developed by Mrs. McCurrach.

The Court finds no merit in these contentions.

The defendant further charges that proceedings in interference in the United States Patent Office between plaintiff's patent and that of one Siegel, justifies the court in denying plaintiff equitable relief.

Mr. Schofield secured authority from plaintiff May 21, 1943 and examined the records in that proceeding and upon an examination of the file. wrapper I find that the successive steps taken were approved by the Patent Office, and overrule that contention.

On the other hand, it appears that during the prosecution of the defendant's patent, Mr. Schofield visited the Patent Office on June 9, 1941, on other business. He called at Division No. 24 and asked the status of the Cheney and Tedford application. The official in charge, with whom Mr. Schofield had formerly served in that Bureau, stated that he had just finally rejected the application and handed to Mr. Schofield a copy of the final rejection. Mr. Schofield testified he had forgotten the wording of it, but that he pointed out wherein he thought the ruling was erroneous and asked for a reconsideration. Upon his return home he said he was dumbfounded to find a notice of allowance dated June 10. He admitted that procedure was unusual.

Rule 68 of the U. S. Patent Office, 35 U.S.C.A.Appendix, provides in part:

"In every instance where reconsideration is requested in view of an interview with the examiner or his assistant, the applicant, his attorney or agent must file a written statement of the reasons presented at the interview as warranting favorable action."

Mr. Schofield was familiar with that rule and made no attempt to comply with it, nor seek to have the Rule waived, but in the disposition of this case, that does not concern this Court, rather it is a matter for the consideration of the Commissioner of Patents.

■ It seems to be well settled that patents interfere only when they claim in whole or in part, substantially the same invention. Glade v. Walgreen Co. 7 Cir., 122 F.2d 306, certiorari denied 314 U.S. 692, 62 S.Ct. 362, 86 L.Ed. 553. Defendant claims a different invention.

■ The next question presented for this Court to determine is, whether there is any actual controversy between the parties with respect to the defendant's patent of which this Court can take jurisdiction.

There were three occasions when examinations before trial were had and on one or more of these occasions efforts were made to adjust amicably the differences between the parties.

Mr. McCurrach, examined by his counsel, testified:

"Q. Well, did the defendant ever charge the plaintiff with infringement of this patent in suit? A. No, I don't know the word "charge." I take it for granted that you meant that that is a formal charge.

"Q. Well, I mean did they in any way, formally or otherwise ever state to you that their patent was infringed by any act of the defendant in their opinion. A. They certainly intimated it. * * *

"Q. What representative of the defendant implied such a claim. A. Mr. Byrne."

This is alleged to have occurred during an examination before trial in May 1943, prior to the amendment of the complaint.

The witness continued:

"We had an informal discussion about our various positions in the matter, and in discussing—how shall I put it—the virtues of the patent, Mr. Byrne gave me the very definite impression that I needed his patent because I couldn't go ahead and manufacture mine without going against some of his claims. * * *

"Q. What did you do about such charge or claim with respect to action in this suit? A. Well, I spoke to you, telling you (Mr. Cuningham who came into the case in Sept. 1943) that as long as there was any possibility of our infringing their patent, there were certain people with whom we had had some preliminary negotiations who had simply stated as long as there was any legal complications at all they would not talk to us until it was all cleared up, and I spoke to

you about it and you told me that there was a legal way to solve it and get it settled, and I don't know the terms. I guess that is the declaratory judgment that we applied for."

Mr. McCurrach further testified:

"Mr. Byrne said that the method by which—in order to be able to proceed with the method which we had been using, we would need a cross license under his patent and the dies were that method.

"Q. Did Mr. Shumacher say anything about it in your presence? A. I don't remember his saying anything.

"Q. Was there any further conversation on that subject? A. No, I wasn't in it."

He then referred to later conversations on the taking of depositions in December 1943 and May 1944, with both Mr. Cheney and Mr. Byrne, and said:

"I can't say anything was said which added anything to what was said the first time."

(It may be noted here that the plaintiff had been using dies before defendant applied for its patent and for three years before the defendant's patent issued.)

Mr. Shumacher testified that Mr. Byrne made a claim or charge of infringement to him sometime between May 1943 and September 1943. It took place on the telephone. Shumacher said:

"The only thing I clearly recall was his statement that the McCurrach tie infringes the Cheney patent. That is the only thing that struck my mind. We had been trying to settle the case and we had various discussions about the relative merits of the two patents, and we discussed the dies and it had been indicated that the McCurrach patent does not show the dies, and their patent does show the dies."

Mr. Shumacher also remembered the occasion in May 1943 when Mr. Byrne said "we ought to get a license under the Cheney patent. I don't recall anything further than that."

Mr. Byrne denied the statements attributed to him by Mr. Shumacher over the telephone and said, with respect to the discussion in May 1943, that he made no such statements as that attributed to him by either Mr. McCurrach or Mr. Shumacher. He admitted there were a number of talks regarding cross licenses and that he did say "that our patent, the Cheney and Tedford patent was close to or supplemental of" the McCurrach patent.

He conceded that plaintiff's patent would not infringe upon the Cheney and Tedford patent, or contrariwise.

At the examination of Mr. Cheney on January 7, 1944, Mr. Cuningham asked him:

"Q. Mr. Cheney, does the defendant charge the plaintiff with infringement of patent #2,291,531? A. We have given no thought to charging the plaintiff with infringement. * * *

"Mr. Cheney, the plaintiff invites the defendant to do so, and to advise the plaintiff within a reasonable time, say two weeks, of its intention to so charge infringement, or its intention not to so charge infringement."

At the trial Mr. Cheney admitted he had not complied with that request and stated, in his opinion, the McCurrach tie made under the plaintiff's patent does not infringe the Cheney-Tedford patent.

Mr. Griffin, the vice president of the defendant, in charge of sales, testified to a conversation at lunch on the day of the examination before trial on January 7, 1944, at which Mr. Cuningham, Mr. Byrne, Mr. Cheney and Mr. Tedford were present. Mr. Cuningham stated:

"I am sorry Mr. Cheney that you decided not to charge infringement but, however, I have other plans."

He also testified that the meeting at McCurrach's office in May 1943 was very hectic. He was unable to recall that he was examined before trial in May of this year concerning that previous examination of Mr. McCurrach. Mr. Cuningham then read to him from his deposition:

"Q. What did take place specifically as to that matter at this conference?" And his answer—

"A. My recollection is it was an examination of Mr. McCurrach, I was there merely as a spectator, listening, and unworried very much about the testimony. I had other things on my mind, mainly that we didn't get too involved in any such idea as Mr. McCurrach presented that we might pay him a royalty on manufacturing under a patent which our attorney told us was a good patent."

"Q. Do you recall that occurrence? A. That is correct, sir; but I understood I said to you before these remarks were made that I wanted to talk off the record and I didn't know the stenographer was taking it down, and I didn't understand that I was giving testimony."

And then he proceeded to affirm that he "never heard any charge that Cheney Brothers claimed McCurrach infringed" and with respect to Mr. Cuningham's invitation of Jan. 7th regarding action against McCurrach for infringement, he did not understand what it was about or "how we could be in a position to charge him with infringement" but in a subsequent discussion with Mr. Cheney he asked: "Well, what is this fellow Cuningham talking about? What is he driving at? They are suing us for infringement and he asks us are we going to sue them. What is he driving at? I don't understand it." And Mr. Cheney replied: "A. I don't know the ways of these lawyers. We will have to see what comes out of it."

Mr. Schofield was not interrogated on the subject of any of these conversations.

The plaintiff has not established, to my satisfaction, that such an actual controversy existed in the constitutional sense that a juridical claim is set forth, over which this court would have jurisdiction as in Ætna Life Ins. Co. of Hartford, Conn. v. Haworth 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826; or Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450.

The plaintiff is entitled to a decree sustaining the patent and the claimed infringement thereof and for an injunction; the second and third causes of action are dismissed, but, so that the plaintiff will not be precluded in any way by the judgment herein in any future litigation involving the validity of the defendant's patent, such dismissal is without prejudice.